Newman HOWARD; Gilbert Leon Allen; Joan Howard; Theodore H. Pope, as Representatives of Plan Participants Similarly Situated on Behalf of the Employee Stock Ownership Plan of Pacific Architects and Engineers Incorporated, Plaintiffs–Appellants,

v.

Edward A. SHAY; Martin L. Lehrer; Richard L. Smith; Allen Shay; Pacific Architects and Engineers, Inc., Defendants–Appellees.

No. 93–56605.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 10, 1995.

Decided Nov. 22, 1996.

Raymond G. Kolts, Gary C. Nawa, Kolts & Nawa, Pasadena, CA, for plaintiffs-appellants.

Lester G. Ostrov, Fogel, Feldman, Ostrov, Ringler & Klevens, Santa Monica, CA, for defendants-appellees.

Wayne R. Berry, United States Department of Labor, Plan Benefits Security Division, Washington, DC, for the amicus curiae.

Before FARRIS, O'SCANNLAIN and TASHIMA,* Circuit Judges.

Opinion by Judge FARRIS; Dissent by Judge O'SCANNLAIN.

FARRIS, Circuit Judge:

## INTRODUCTION

The plaintiffs are participants in an Employee Stock Ownership Plan that was created for the benefit of the employees of Pacific Architects and Engineers, Inc., a California corporation. In 1974, the ESOP purchased approximately 40% of Pacific's stock from Edward Shay for $4,269,162, or $10.67 per share. Shay was the president and chairman of Pacific, he was one of the ESOP's fiduciaries, and, prior to the sale, he owned 100% of Pacific's stock. In 1988, Shay's co-fiduciaries, Richard Smith and Martin Lehrer, both of whom worked for Shay as senior executives, caused the ESOP to sell its Pacific stock back to Shay for $14.40 per share, a price determined by Arthur Young, Inc., the ESOP's valuator. On its purchase and sale of the Pacific stock, the ESOP earned a compound annual return of 2.2%, a meagre gain considering that while the ESOP held the Pacific stock, the company was a substantial beneficiary of what Arthur Young called a "parabolic" rise in Japanese real estate values. The ESOP participants sued Shay, Lehrer, and Smith under ERISA for breach of their fiduciary duties. The district court held a bench trial and concluded that there was no breach and that the ESOP received adequate consideration for its stock. We reverse and remand for a determination of damages.

## BACKGROUND

### I. The Transaction

Pacific was primarily a real estate holding company, although it also had engineering and architecture operations. It owned both foreign and domestic real estate, and held a 50% interest in a Japanese real estate corporation called K.K. Halifax. Pacific created the ESOP in 1972 as an "employee pension benefit plan" as defined by ERISA. 29 U.S.C. § 1002(2)(A)(ii). Prior to the 1988 transaction, Shay, Smith, and Lehrer were the three fiduciaries of the ESOP and were members of its advisory committee.

In 1987, Smith contemplated the possibility of terminating the ESOP and consulted with Private Capital Corp., a financial advisor. Private Capital told Smith that there were problems with the valuation methodology used by Pacific's valuator, Emco Financial Ltd., and recommended that Pacific replace Emco with a valuator capable of valuing Japanese real estate. Following Private Capital's advice, Smith began a search for a new valuator. After speaking with a number of firms and discussing with them the applicability of liquidity and minority interest discounts, Smith selected Arthur Young. As a condition of its retention, Arthur Young agreed not to contact Jardine Mathison, who owned the other 50% of K.K. Halifax. In May 1988, Arthur Young performed its first valuation and concluded that the ESOP's stock was worth $14.40 per share.

By July 1988, Pacific executives had informed Arthur Young that Shay was interested in purchasing the ESOP's stock and in September the ESOP administrative committee formally retained Arthur Young to perform a valuation to assist them in considering a possible offer. On November 8, 1988, Arthur Young issued a valuation report and fairness opinion representing that the ESOP's stock was worth $14.40 per share. That day, Pacific's board, which included Shay, Lehrer, and Smith, voted to terminate the ESOP. And by the next day, the ESOP administrative committee had voted to sell all of the ESOP's Pacific stock to the E. & A. Shay Irrevocable Trust. Shay abstained from both votes. Lehrer admits, however, that the ESOP administrative committee had agreed in advance that the Arthur Young valuation would set the transaction price, even though the fiduciaries had not yet seen the Arthur Young valuation.

* At the time of oral argument, Judge Tashima was a United States District Judge for the Central District of California, sitting by designation.

## II. *The Arthur Young Valuation*

Because the fiduciaries relied on Arthur Young's valuation without further investigation, it is necessary to consider Arthur Young's methodology. To help Arthur Young value Pacific, the fiduciaries provided it with historical financial statements and independent real estate appraisals. Arthur Young stated that it relied completely on this information: "We have relied upon the assertion of management and other third parties that the financial data and real estate appraisal reports described in this report provide a reasonable representation of the fair market value and historical operation of the company and the condition of [Pacific's] real estate investments." Also, Arthur Young relied on Pacific attorney Carol May's assertion that Cal. Corp.Code § 1800, the statute that protects minority interest shareholders, did not give the ESOP the right to trigger an involuntary dissolution: "Our opinion is based upon the representation by both [Pacific's] management and the ESOP's administrator that they have reviewed the provisions of Section 1800(b)(1)-(6) of the California Corporations Code (Code) and that there were no facts existing that would provide grounds for the involuntary dissolution of [Pacific]."

Arthur Young defined the fair market value of the ESOP block as "the price at which the property would exchange between a willing buyer and a willing seller, neither being under compulsion to buy or sell, each having reasonable knowledge of all relevant facts, and with equity to both." Based on the information provided, Arthur Young separated Pacific's three asset components and assigned values to each. These included (1) Pacific's 50% interest in K.K. Halifax, a venture that held Japanese real estate, (2) Pacific's interests in other real estate, and (3) Pacific's operations. The Japanese real estate had been appraised at $120,178,000, making the net asset value of Pacific's 50% interest worth $59,997,000, after minor adjustments. The other real estate had been appraised at $18,178,000. And Arthur Young estimated the value of Pacific's operations to be $5,250,000.

To derive a value for the ESOP's stock, Arthur Young applied a series of discounts. First, Arthur Young applied a 60% discount to Pacific's interest in K.K. Halifax. Next, because the ESOP owned only 40% of Pacific and could not control the company, Arthur Young applied a minority interest discount of 40 to 50%. And finally, because there was no ready market in Pacific stock, Arthur Young applied a liquidity discount of 50%. By applying these discounts, Arthur Young calculated that although Pacific had a net asset value over $83 million, for a per share net asset value of over $83, the fair market value of the ESOP's stock was $14.40 per share.

Arthur Young's primary input in valuing Pacific was selecting the three discount factors. We review briefly its justifications for each. First, with respect to the 60% discount applied to Pacific's 50% interest in K.K. Halifax, Arthur Young's valuation report explained that Pacific did not have controlling interest, that the other 50% owner was more powerful than Pacific, and that Japanese real estate was overvalued and volatile. But Arthur Young presented no studies of Japanese minority interest or liquidity discounts, nor did it present any analysis of Japanese ventures with comparable discount factors. In its May valuation, Arthur Young had actually applied a 40% discount, but in its November valuation, it gave no explanation why it increased the discount by twenty percentage points.

Second, with respect to the 40 to 50% minority interest discount, Arthur Young explained that it was typical for investors in late 1987 to pay 40% premium for control, and that this would correlate to a 28.6% discount factor. Although an outside study cited by Arthur Young indicated that this was consistent with historical discounts, Arthur Young concluded that 28.6% was too low for Pacific and multiplied this number by 1.5 to reflect a variety of factors including "concern[s] about future potential declines in Japan's real estate prices," Japan's higher tax rate, and "the volatility of the dollar/yen exchange rate." Arthur Young did not consider whether Cal. Corp.Code § 1800 would have a countervailing affect; it did not explain why the factors it cited warranted jack-

ing up the average minority interest discount by 150%, as opposed to some lesser percent; and it did not compare Pacific with companies that had minority interest discounts that deviated 150% from the average.

Third, with respect to the liquidity discount, Arthur Young cited four studies "which indicated an average or median marketability discount of approximately 30 to 35 percent." Arthur Young concluded, however, that this amount was too low and that 50% was a more appropriate liquidity discount. Its reasons for deviating from the average included the fact that Pacific had "the right of first refusal for any ESOP stock," Pacific had litigation exposure, and the Japanese real estate market was overvalued and volatile. Arthur Young did not explain why it settled on 50%, as opposed to a percent closer to the average, and it did not compare Pacific with other companies that had 50% liquidity discounts.

### III.   *The District Court Opinion*

After a six week bench trial, the district court ruled in favor of the ESOP fiduciaries. The district court found that Arthur Young had received from the fiduciaries "all relevant, material information," and that Cal. Corp.Code § 1800 was preempted by ERISA. The district court remarked that "utilizing the business judgment rule this Court cannot find that the [Pacific] ESOP committee breached any fiduciary duty in relying on the Arthur Young & Company independent valuation and fairness opinion...." It concluded that the fiduciaries had acted with the "care, skill ... and diligence of a prudent fiduciary" and that $14.40 per share was "full, fair, and adequate consideration."

### DISCUSSION

■ "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). An ERISA fiduciary must act for the exclusive benefit of plan beneficiaries, 29 U.S.C. § 1104(a)(1), and must act "with the care, skill, prudence, and

diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). These duties are the "highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 272 n. 8 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). To enforce them, the court focuses not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction. *Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir.1983); *Donovan v. Mazzola,* 716 F.2d 1226, 1233 (9th Cir.1983) (question is whether fiduciary "employed the appropriate methods to investigate the merits of the investment and to structure the investment").

■ In addition to imposing duties of loyalty and care, ERISA explicitly prohibits a fiduciary from engaging in self-dealing transactions: "A fiduciary with respect to a plan shall not ... (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." 29 U.S.C. § 1106(b). ERISA creates an exception to this prohibition, however, by permitting "the acquisition or sale by a plan of qualifying employer securities ... (1) if such acquisition [or] sale ... is for adequate consideration." 29 U.S.C. § 1108(e). Like the inquiry into whether a fiduciary acted with loyalty and care, the inquiry into whether the ESOP received adequate consideration focuses on the thoroughness of the fiduciary's investigation. *Cunningham,* 716 F.2d at 1467–68.

■ A fiduciary who engages in a self-dealing transaction pursuant to 29 U.S.C. § 1108(e) has the burden of proving that he fulfilled his duties of care and loyalty and that the ESOP received adequate consideration. *Id.* at 1467–68; *see also Marshall v. Snyder,* 572 F.2d 894, 900 (2d Cir.1978). This burden is a heavy one. When it is "possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent in-

vestigation of their options to insure that they act in the best interests of the plan beneficiaries." *Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir.1984).

■ Although securing an independent assessment from a financial advisor or legal counsel is evidence of a thorough investigation, *Martin v. Feilen*, 965 F.2d 660, 670–71 (8th Cir.1992), it is not a complete defense to a charge of imprudence. *See Mazzola*, 716 F.2d at 1234. As Judge Friendly has explained, independent expert advice is not a "whitewash." *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir.1982); *Donovan v. Walton*, 609 F.Supp. 1221, 1227 n. 10 (D.C.Fla. 1985); *Cator v. Herrgott & Wilson, Inc.*, 609 F.Supp. 12, 16 (D.C.Cal.1984). The fiduciary must (1) investigate the expert's qualifications, *Mazzola*, 716 F.2d at 1234, (2) provide the expert with complete and accurate information, *Cunningham*, 716 F.2d at 1467, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances. *Id.* at 1474; *see also* Jordan, Pflepsen, Jr., & Goldberg, *ERISA Litigation Handbook*, § 3.03[A] (1994).

■ The plaintiffs have argued that the district court erred in applying the business judgment rule, rather than the prudent man standard. We agree that the district court exhibited some confusion over the correct articulation of the prudent man standard. The business judgment rule is a creature of corporate, not trust, law. But we reverse on the grounds that even if the district court applied the prudent man standard, it did not apply it correctly. The fiduciaries failed to carry their burden of proving that they fulfilled their duties of care and loyalty and that the ESOP received adequate consideration.

The focus is on the thoroughness of the investigation. The fiduciaries completed the transaction without negotiation. Rather than shop the stock to a third-party buyer or appoint a non-conflicted fiduciary, the fiduciaries relied on the Arthur Young valuation, but they did not question the valuation

or retain a second firm to review it. Even a cursory review of the Arthur Young valuation and fairness opinion reveals the carelessness of this tack. First, Arthur Young discounted the value of Pacific's ownership of K.K. Halifax by 60%, thereby erasing more than $35 million of value (before the application of liquidity and minority interest discounts), without providing any empirical support for a 60% discount or giving any explanation as to why it increased this discount factor twenty percentage points since its May valuation. A prudent fiduciary would have sought an explanation.

Second, Arthur Young applied a minority interest discount substantially higher than the recent historical average, but it did not consider whether protections offered by Cal. Corp.Code § 1800 would weigh against a higher discount,[1] and it assumed that Shay was entitled to the full benefit of this discount even though, once purchased, the ESOP's minority block would merge with his controlling block and he would capture all of the increased value. A prudent fiduciary would have questioned these assumptions.

And finally, Arthur Young applied a liquidity discount more than fifteen percentage points above the historical average. Although it gave reasons for deviating from the average, Arthur Young did not explain why these reasons resulted in an increase of fifteen percentage points as opposed to some lesser amount. Moreover, Arthur Young explained that the reason for the high liquidity discount factor was the overvaluation and volatility of Japanese real estate, even though it had already cited this as a reason for increasing the K.K. Halifax and minority interest discounts. Again, a prudent fiduciary would have questioned the fifteen percentage point adjustment and might have probed whether triple counting the overvaluation and volatility of Japanese real estate was appropriate.

An independent appraisal "is not a magic wand that fiduciaries may simply wave over a

---

1. We agree with plaintiffs that the district court erred in finding that ERISA preempts Cal. Corp. Code § 1800. 29 U.S.C. § 1144; *see Aloha Airlines, Inc. v. Ahue*, 12 F.3d 1498, 1504 (9th Cir.1993). It seems, however, that even if ERISA did preempt Cal. Corp.Code § 1800, the statute would nevertheless deflate Pacific's minority interest discount, since a third-party buyer would be entitled to its possible benefit.

transaction to ensure that their responsibilities are fulfilled. It is a tool and, like all tools, is useful only if used properly." *Cunningham*, 716 F.2d at 1474. To justifiably rely on an independent appraisal, a conflicted fiduciary need not become an expert in the valuation of closely held corporations. But the fiduciary is required to make an honest, objective effort to read the valuation, understand it, and question the methods and assumptions that do not make sense. If after a careful review of the valuation and a discussion with the expert, there are still uncertainties, the fiduciary should have a second firm review the valuation.

Adopting the alternative rule—that an independent appraisal is a complete defense to a charge of imprudence—would be foolish, especially in cases in which there is a strong possibility of self-dealing. No court has adopted this rule, and the reason is fairly obvious. A fiduciary determined to self-deal has ample opportunity to sway the final valuation that will set the transaction price. The fiduciary can do so either in selecting of the expert or by limiting the information conveyed to the expert. This case illustrates the danger. Not only did Smith discuss liquidity and minority interest discounts with prospective valuators, but also, at least one firm, Ernst & Whinney, balked at his conditions of retention.

Conflicted fiduciaries do not fulfill ERISA's investigative requirements by merely hiring an expert. Shay, Smith, and Lehrer did nothing else. A day after they got Arthur Young's valuation, they completed the transaction. They did not meaningfully review, discuss, or question the valuation. We cannot affirm the district court's holding that the fiduciaries carried their burden of proving that they fulfilled their ERISA duties and that the ESOP received adequate consideration for its Pacific stock.

REVERSED and REMANDED.

O'SCANNLAIN, Circuit Judge, dissenting:

I agree with the majority that ERISA fiduciaries are held to the standard not of a "prudent lay person" but rather of a "prudent fiduciary with experience dealing with a similar enterprise." *Whitfield v. Cohen*, 682 F.Supp. 188, 194 (S.D.N.Y.1988). If they do not have all of the knowledge and expertise necessary to make a prudent decision, they have a duty to obtain independent advice. Of course, the mere seeking of an independent appraisal does not, by itself, satisfy the prudence requirement. As the Fifth Circuit noted in an oft-quoted passage, "[a]n independent appraisal is not a magic wand that fiduciaries may simply waive over a transaction to ensure that their responsibilities are fulfilled. It is a tool, and, like all tools, is useful only if used properly." *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983).

Nevertheless, I know of no case in which ERISA fiduciaries were adjudged to have breached their duty when they carefully selected and accurately informed the independent appraiser of the relevant data. In fact, the Fifth Circuit has held that

> [t]o use an independent appraisal properly, ERISA fiduciaries need not become experts in the valuation of closely-held stock-they are entitled to rely on the expertise of others. However, as the source of the information upon which the experts' opinions are based, the fiduciaries are responsible for ensuring that that information is complete and up-to-date.

*Cunningham*, 716 F.2d at 1474 (citation omitted).

The majority cites this Fifth Circuit case to support the creation of a new and unwarranted requirement for ERISA fiduciaries who would obtain expert opinions-that fiduciaries must make certain that reliance on an expert's advice is reasonably justified under the circumstances. *Cunningham* simply does not stand for this proposition. The fiduciaries in that case had relied on an expert's valuation of the stock made *13 and 20 months before* the ESOP transactions. By the time of the ESOP transactions, the fiduciaries knew that the growth projections used by the expert were incorrect-the company had not actually done as well as projected. The fiduciaries nonetheless used the expert's valuation opinion to set the price of the stock for the ESOP transaction. The Fifth Circuit

held that the fiduciaries had breached their duties-that they must provide complete and up-to-date information to experts before relying on the experts' opinion.

The crucial distinction between *Cunningham* and the case before us is that the *Cunningham* fiduciaries-the company's board of directors-knew that the company had not performed as well as the growth projections. In effect, they knew that the expert's appraisal was out of date. In this case, however, the majority faults the fiduciaries not for providing inaccurate data to the expert, but for failing to question the expert's methodology and valuation assumptions.

The district court specifically found that the fiduciaries in this case used an appropriate selection process in choosing Arthur Young, and that they provided Arthur Young with all relevant, material information. Unless that finding is clearly erroneous, this court should hold that the fiduciaries acted prudently. The majority's unprecedented rule essentially requires the fiduciaries to be experts in subjects in which they admittedly have insufficient knowledge or experience. Fiduciaries use experts precisely because they are not qualified to do the appraisal themselves; once they have carefully selected and adequately informed the expert, they should be able to rely on the expert's conclusions.

The district court also found that Arthur Young's valuation was appropriate, and that the price Arthur Young recommended was adequate and fair. Unless that finding is also clearly erroneous, there is little basis for claiming that the fiduciaries' reliance on Arthur Young's valuation was unreasonable or imprudent.

I respectfully dissent.