RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0324P (6th Cir.)
File Name: 03a0324p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

LESTER GREGG, MICHAEL
HUMESTON, FRANK JAEGER,
ALFRED KLINGER, EMILIO
PROCELLI, ROBERT
RICHARDS, THOMAS SACK,
PAUL WINKLER and SHIRLEY
WINKLER,
     *Plaintiffs-Appellants,*

     *v.*

TRANSPORTATION WORKERS
OF AMERICA INTERNATIONAL,
SONNY HALL and JOHN
ORLANDO,
     *Defendants-Appellees.*

No. 01-4159

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-02659—Patricia A. Gaughan, District Judge.

Argued: June 11, 2003

Decided and Filed: September 11, 2003

2    *Gregg, et al. v. Transportation*    No. 01-4159
    *Workers of America, et al.*

Before: KEITH, BATCHELDER, and CLAY, Circuit
Judges.

—————————

## COUNSEL

**ARGUED:** Michael F. Dadisman, Independence, Ohio, for
Appellants. Randy D. Rinicella, ROETZEL & ANDRESS,
Cleveland, Ohio, for Appellees. **ON BRIEF:** Michael F.
Dadisman, Independence, Ohio, for Appellants. Randy D.
Rinicella, ROETZEL & ANDRESS, for Appellees.

   CLAY, J., delivered the opinion of the court, in which
KEITH, J., joined. BATCHELDER, J. (pp. 31-32), delivered
a separate opinion concurring in the result only.

—————————

## OPINION

—————————

   CLAY, Circuit Judge. Plaintiffs Lester Gregg, Michael
Humeston, Frank Jaeger, Alfred Klinger, Emilio Procelli,
Thomas Sack, Robert Richards, Paul Winkler and Shirley
Winkler appeal an October 2, 2001 order granting Defendants
Transportation Workers of America International, Sonny
Hall, and John Orlando summary judgment in Plaintiffs'
action alleging breach of fiduciary duty brought pursuant to
the Employee Retirement Income Securities Act ("ERISA"),
29 U.S.C. § 1132(a)(1)(B) and (e)(1). For the reasons set
forth below, we **REVERSE** the district court.

### FACTS

   With the exception of Shirley Winkler, Paul Winkler's
wife, Plaintiffs are or were members of the Defendant
Transportation Workers Union of America ("TWU"), Air

Transport Division. Plaintiff Sack lives in North Carolina while the others reside in Ohio. Each obtained group term life insurance under a master policy issued by Transamerica Assurance Company.[1] Their policies became effective January 1, 1996.

TWU is an international union with approximately 100,000 members, including, *inter alia*, employees of American Airlines. Defendant Hall is the President of TWU and held that post at all times relevant to this action. Defendant Orlando is the Vice President of TWU's Air Transport Division and also held this post at all times relevant to this action. Both Hall and Orlando participated in acquiring the policies on the behalf of TWU's members.

In 1995, American Airlines announced that it would replace the prior life insurance policy it provided for its employees, including members of TWU's Air Transport Division, with an age-rated group term life insurance policy. The new plan would cause premiums to significantly increase, particularly for older workers. As a result, union members began contacting their local presidents to express concern about the high cost of American Airlines' new insurance plan. Responding to these concerns, TWU's Air Transport Division began to investigate alternative insurance options.

Hall asked TWU's insurance broker, Future Planning Associates ("FPA") to meet with the Union's local presidents to determine if more affordable insurance alternatives existed. FPA received compensation from insurance companies for facilitating the sale of policies. FPA interviewed at least two companies. Additionally, TWU retained an independent actuary, Lawrence Silkes, to review and evaluate the various insurance proposals. TWU also purports to have retained

Christian Wozny, an insurance expert holding a Chartered Life Underwriters ("CLU") designation, to review different plans.[2] FPA and the actuary determined that the Plan offered by Transamerica Assurance Corporation represented the best option. Along with TWU's local presidents, FPA and Silkes negotiated the Plan's precise terms with Transamerica.

After reaching an agreement with Transamerica, FPA worked with TWU's local presidents to disseminate the Plan's details to the union membership. This effort included posting information at airports and mailing material to individual members. As one of these bulletins made clear, in large print, the policy offered "[a] flat-rate premium that will not increase with age." (J.A. at 516.) Another contained the exuberant headline, "NO INCREASES DUE TO AGE." (J.A. at 517.) The union documents also included a question-and-answer form and other correspondence explaining the plan's features. The question-and-answer sheet contained the following information:

QUESTION:     Can I continue my TWU OTP Plan after
                        retirement at the same monthly flat rate?

---

[1] At various points, the policy is called the "TWU OTP" policy. OTP stands for "Optional Term Policy."

[2] Without any citation to the record, Defendants claim "the Union retained an insurance expert who held the Chartered Life Underwriter (CLU) designation to review the various plans under consideration." (Defendants' Brief at 4-5.) The CLU designee is not mentioned elsewhere in Defendants' brief, nor does Orlando mention him at any point in his deposition. The district court's opinion provides his name, but cites to one of Hall's affidavits (merely mentioning Wozny's name) and to a page in Hall's deposition that never mentions Christian Wozny. Without the ability to establish what role, if any, Wozny assumed, we cannot use Wozny's ephemeral appearance in Defendants' brief and uncertain participation in the policy selection process to support Defendants' argument that no genuine issue of material fact exists as to whether Defendants breached their fiduciary duty.

ANSWER:    Yes.  The TWU OTP Plan can be continued indefinitely after retirement at the same monthly rate.

. . . .

QUESTION:    Can the monthly flat rate for the TWU OTP Plan increase because of age?

ANSWER:    No.

. . . .

QUESTION:    Can the monthly flat rate for the TWU OTP Plan increase for any other reason?

ANSWER:    Yes.  The rate may increase like all other plans of this type if the death claims experience is higher than it has been in the past for TWU members. . . . If death claims experience is lower than it has been for TWU members, the monthly flat rate for the TWU OTP Plan members could be *reduced*.

(J.A. at 521-23) (emphasis in original).

Defendants also made in-person presentations to union members, including Plaintiffs.  At one of these information sessions, several Plaintiffs asked questions about possible rate increases and the ability to keep their coverage when retired. TWU's representatives and FPA members told the audience that the current premium would not increase for three years and that any eventual increase would be minimal.  As Plaintiff Paul Winkler testified in his deposition, the union claimed that "if the cost went up at all, it would only be a penny or two, and that wouldn't be for at least three years." (J.A. at 533.)  Plaintiff Gregg gave similar testimony:

COUNSEL:    And the rate increase you're referring to, you've said it several times, someone told you it would just be pennies, correct?

GREGG:    If anything, it would go up a few cents or a couple of pennies.

COUNSEL:    That was told to you on one occasion, right?

GREGG:    At the meeting.  At the meeting from the representative, whoever those gentlemen were from.

. . . .

COUNSEL:    And you're not sure the person who spoke those words about the pennies increase, you don't know that person's name, correct?

GREGG:    No, I don't know his name, no.

COUNSEL:    And you don't know who they represented, do you?

GREGG:    I understand they represented the union, because the union sent them there.  It was a union meeting, so it had to be the union, that's what I thought.

(J.A. at 433.)  The presenters also informed Plaintiffs that coverage would not decrease nor would rates increase due to the age of the policyholder, and that coverage would continue into retirement.

TWU and FPA made policy applications available at these meetings.  Members enrolled using a standard enrollment form.  Every union member who chose to enroll received a

document titled "Group Term Life Insurance Certificate." The Certificate described the insured's right to review the Group Master Policy, although Transamerica retained its copy in New York City and TWU kept the union's copy at its Dallas offices. Defendants claim that each Certificate "expressly described . . . the conditions under which the Plan could be terminated." (Defendants' Brief at 6.) Defendants, however, do not cite to a specific page in the record. (*See id*.) Under the heading "WHEN INSURANCE STOPS," the Certificate explains:

> Your insurance stops at the earliest of: (1) the date of your death; (2) 31 days after a premium due date, if the premiums for your insurance have not been paid; (3) the date your membership with the Organization ends; (4) *the date the Group Master Policy is amended so that your insurance stops*; (5) *the date the Group Master Policy stops*; or (6) the date you ask, in writing, for it to stop.

(J.A. at 359) (emphasis added). The Certificate does not explain the circumstances that could cause TWU and Transamerica to amend the Group Master Policy, nor does the Certificate describe when (or how) the Group Master Policy could stop. Following their union's advice, Plaintiffs enrolled.

Actually, Transamerica could terminate the policy or modify its terms after a three-year period. What Defendants Hall and Orlando knew is unclear. In his deposition, Orlando generally denied any inconsistency between the Group Master Policy's terms and what TWU informed its membership. Hall evidently never read the Group Master Policy:

COUNSEL: Mr. Hall, you signed the group master policy for the Transamerica policy for all members?

HALL:       Yes.

COUNSEL:  Did you read the policy?

HALL:       No.

COUNSEL:  Why not?

HALL:       Because my broker and my ATD [Air Transportation Division] Director [Orlando] said this is all that has been agreed to. Just the policy the International President would sign and I believe everything in it was accurate. No, I didn't read it.

(J.A. at 590.) Defendant Hall also did not know that Transamerica could unilaterally terminate the policy on sixty days notice after January 1, 1999, or that Transamerica could unilaterally terminate the Master Policy if it covered fewer than fifty insureds:

COUNSEL:  None of these four documents [distributed to the membership] mention the fact that there has to be at least fifty people in this plan?

. . . .

HALL:       None of these documents say that.

QUESTION:  When did you—when were you first informed that there has to be at least a minimum of fifty people?

HALL:       Just now.

COUNSEL:  Today?

HALL:          You just informed me of that.

. . . .

COUNSEL:    Is there anything in any of these exhibits [the documents distributed to membership] that even notifies the bargaining units that in sixty days it can be unilaterally terminated?

HALL:          Not that I read in there, no.

(J.A. at 587-88.) Defendant Hall distributed information to union members based on what FPA broker John Pescitelli told him. He did not verify the information Pescitelli provided with any other source.

After the group policy became effective on January 1, 1996, Transamerica experienced substantial losses. Various factors contributed to the insurer's problems, including (1) American Airlines' offer of early retirement to certain union members, many of whom accepted; (2) a predominately older group of insureds; and (3) a surprisingly high number of claims. As early as October of 1996, only nine months after the policy became effective, Transamerica's claims expenses equaled 1.4 times the premiums paid. Consequently, in September of 1998, Transamerica notified TWU that it would exercise its contractual right to terminate the policy effective January 1, 1999.

Faced with this forthcoming termination, FPA negotiated an amended policy with Transamerica that would become effective January 1, 1999. The parties agreed to new terms, pursuant to which union members' premiums would increase from $0.40 per $1000 of coverage (regardless of age) to a new age-based rate schedule:

| Age | Rate Per $1000 of Coverage |
|---|---|
| Under 50 | $0.45 |
| 50-59 | $0.73 |
| Over 59 | $0.76 |

The highest new rate still remained lower than the alternative offered by American Airlines, which required premiums of $2.55 per $1000 of coverage. Nevertheless, under the policy the union promised, a fifty-nine-year-old insured would pay $1,200 annually in monthly premiums for a $250,000 policy, but that insured now must pay $2,280 for the same initial coverage. Worse, the $250,000 policy would only remain worth $250,000 temporarily because coverage would decrease after age sixty-four:

| Age | Percentage of Coverage |
|---|---|
| 65 | 92% |
| 66 | 85% |
| 67 | 78% |
| 68 | 72% |
| 69 | 66% |
| 70 | 61% |
| 71 | 56% |
| 72 | 52% |
| 73 | 48% |

| 74 | 44% |
|---|---|
| 75 | 41% |
| Over 75 | 38% |

Thus, when the insured turns seventy-five under the policy the union promised, he would still pay only $1,200 in annual premiums for a $250,000 policy. Under the new policy, a seventy-five-year-old insured would pay $2,280 for only $95,000 in coverage. The difference between the promised policy and the new policy becomes increasingly stark as insureds age: by seventy-five, the new policy forces insured to pay an *additional* $1080 in annual premiums for $155,000 *less* in coverage.

The union retained the same independent actuary who reviewed the original policy, and the actuary recommended the new policy. The FPA also negotiated a one-time election for all retired union members (or members who would retire by January 1, 1999) age sixty-five or older, to choose non-reducing coverage, *i.e.*, death benefits that would not decrease at the same rates established by the new policy. Plaintiffs Paul Winkler and Gregg availed themselves of this one-time election and remain beneficiaries under the new policy.

Dissatisfied with the premium increases and benefit reductions, Plaintiffs filed a complaint in United States District Court against TWU, Transamerica, Hall, and Orlando. Plaintiffs alleged Hall, Orlando and TWU breached their fiduciary duty under ERISA. Plaintiffs also alleged breach of contract against Transamerica for terminating the original Group Master Policy.

On July 25, 2000, Transamerica moved for summary judgment. The district court granted that motion on

November 9, 2000. Plaintiffs do not contest that decision and Transamerica is not a party to this appeal.

The remaining Defendants moved for summary judgment on June 13, 2001, and Plaintiffs moved for summary judgment two days later. On October 2, 2001, the district court granted Defendants' motion. On October 26, 2001, Plaintiffs filed a timely notice of appeal.

## DISCUSSION

This case requires us to determine what duties Defendants had to Plaintiffs and whether a genuine issue of material fact exists as to whether Defendants breached any such duties.

### I.

We review summary judgment *de novo*. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 466 n.10 (1992). Summary judgment is appropriate when there is no genuine issue of material fact, thereby entitling the movant to a judgment as a matter of law. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 882 (6th Cir. 1996). In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986), the Supreme Court explained that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 322. Thus, our "inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a verdict." *Id*.

To defeat summary judgment, the plaintiff "must come forward with more persuasive evidence to support [his or her] claim than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the defendant successfully demonstrates, after a reasonable period of discovery, that the plaintiff cannot produce

sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When determining whether to reach this conclusion, we view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000); *Smith v. Thornburg*, 136 F.3d 1070; 1074 (6th Cir. 1998).

## II.

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). In § 404(a)(1), the statute establishes that a trustee administering a plan that ERISA governs has fiduciary responsibilities:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

   (i) providing benefits to participants and their beneficiaries; and

   (ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan.

29 U.S.C. § 1104(a)(1).

We have explained that the fiduciary duties enumerated in § 404(a)(1) have three components. *See Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995). The first element is a "duty of loyalty" pursuant to which "all decisions regarding an ERISA plan 'must be made with an eye single to the interests of the participants and beneficiaries.'" *Kuper*, 66 F.3d at 1458 (quoting *Berlin v. Mich. Bell Tel. Co.*, 858 F.2d 1154, 1162 (6th Cir.1988)). Second, ERISA imposes a "prudent man" obligation, which is "an unwavering duty" to act both "as a prudent person would act in a similar situation" and "with single-minded devotion" to those same plan participants and beneficiaries.[3] *Id.* (quoting *Berlin*, 858 F.2d at 1162). Finally, an ERISA fiduciary must "'act for the exclusive purpose'" of providing benefits to plan beneficiaries. *Id.* (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)).

---

[3]Courts define "prudent person"as that term is employed in the common law of trusts. *See, e.g., Katsoaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984). "Prudent person" is an objective standard. 29 U.S.C. § 1104(a)(1)(B); *Marshall v. Glass/Metal Ass'n Pension Plan*, 507 F. Supp. 378, 384 (D. Haw. 1980) ("If fiduciaries commit a pension plan's assets to investments which they do not fully understand, they will nonetheless be judged, as provided in [ERISA], according to the standards of others 'acting in like capacity and familiar with such matters.'") (quoting 29 U.S.C. § 1104(a)(1)(B)).

"[T]he duties charged to an ERISA fiduciary are 'the highest known to the law.'" *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002) (quotation omitted). When enforcing these important responsibilities, we "focus[] not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction." *Id.* (citing *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)).

### III.

The district court found that Defendants properly relied on expert advice. In *Chao v. Hall Holding Co.*, this Court adopted a three-part test to evaluate a fiduciary's reliance upon financial advisors. The fiduciary must (1) "investigate the expert's qualifications"; (2) "provide the expert with complete and accurate information"; and (3) "make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Chao*, 285 F.3d at 430 (citing *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1995)).

Plaintiffs do not argue that Defendants failed to investigate their experts' qualifications or provide the experts with complete and accurate information. Defendants have failed to show, however, that no genuine issue of material fact exists as to whether Defendants were reasonably justified in relying on the expert advice they received.

A fiduciary's effort to obtain an independent assessment serves as evidence that the fiduciary undertook a thorough investigation. *Chao*, 285 F.2d at 430; *Howard*, 100 F.3d at 1489; *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983); *Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp.2d 915 (N.D. Ill. 1998). As the Fifth Circuit explained:

A determination whether a fiduciary's reliance on an expert advisor is justified is informed by many factors, including the expert's reputation and experience, the

extensiveness and thoroughness of the expert's investigation, whether the expert's opinion is supported by relevant material, and whether the expert's methods and assumptions are appropriate to the decision at hand.

*Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 301 (5th Cir. 2000). One extremely important factor is whether the expert advisor truly offers independent and impartial advice. *See id.* at 303 ("[A] reasonable factfinder could conclude that RJR failed to structure, let alone conduct, a thorough, *impartial* investigation of which provider or providers best served the interests of the participants and beneficiaries.") (emphasis added); *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982) (Friendly, J.) (requiring a "careful and *impartial* investigation") (emphasis added).

Defendants relied on FPA, however, and FPA served as a *broker*, not an impartial analyst. As Hall explained in his deposition:

QUESTION:    Who is the liaison between the union and Future Planning Associates?

HALL:    That would be John Pescitelli. And at the time some of his representatives, agents, but I can't name them other than John Pescitelli.

QUESTION:    What is Mr. Pescitelli's title with the union?

HALL:    He is the broker of record. And he is also the President of Future Planning.

QUESTION:    Is he a member of the International Union too?

HALL:    No.

QUESTION:   Does he get paid directly by the union?

HALL:        No.

QUESTION:   Is his compensation from Future Planning Associates?

HALL:        Yes.

. . . .

QUESTION:   And you hired them as the broker for about seven years when you became President?

HALL:        Yes. We picked up from the Local and then just hired them as broker for the International. When I say "hire," we don't pay them, as I said. We use them as consulting. He makes fees, whatever he gets from the insurance companies, whomever.

QUESTION:   He gets a percentage?

HALL:        I assume he gets that.

(J.A. at 581.) FPA and Pescitelli, therefore, are not independent analysts. FPA does not work for TWU; rather, insurance companies like Transamerica pay Pescitelli's salary. As a broker, FPA and its employees have an incentive to close deals, not to investigate which of several policies might serve the union best. A business in FPA's position must consider both what plan it can convince the union to accept and the size of the potential commission associated with each alternative. FPA is not an objective analyst any more than the same real estate broker can simultaneously

protect the interests of both buyer and seller or the same attorney can represent both husband and wife in a divorce.

FPA, however, had an enormous role relative to Silkes, the union's actuary.[4] Silkes submitted a brief memorandum endorsing Transamerica. Other than that, no one seems to know precisely what role Silkes assumed. As Orlando testified:

> [T]his Lawrence Silkes guy, he was the actuary that reviewed—and I don't know what they do really, because I'm not—I'm not an insurance salesman by far, so I don't know exactly what they do. But he reviewed the policies or whatever the plan was, and he's the one that made the recommendation that it was okay, you know, that we would be good with this plan.[5]

---

[4] Again, as noted in footnote two, *supra*, we cannot consider what role Christian Wozny had. One would assume that if he had a substantial role, Defendants would have done a better job highlighting his independent input to us.

[5] Orlando also testified:

ORLANDO:    By a letter dated September 6, 1995, I addressed all of the local presidents and gave the outline of what the insurance plan was. And along with it there was a couple of [sic] two or three pages of questions that were addressed by Pescitelli's firm that I had attached to it.

QUESTION:   Okay. You say, "Pescitelli's firm," right?

ORLANDO:    FPA, Future Planning. I think he's the president of Future Planning.

QUESTION:   But doesn't he have to report to you because you're the Vice President of this area?

ORLANDO:    No, he doesn't.

(J.A. at 636-37.) Orlando, the Vice-President of TWU's Air Transport Division, had no idea what Silkes did except that Silkes concluded that the Transamerica plan was acceptable. One can only surmise, for instance, whether Silkes received the information upon which he based his evaluations directly from the insurance companies or through Pescitelli.

Throughout the process, FPA, not Silkes, had the primary role. Orlando testified that FPA "handle[d] everything as far as communication and as far as working with the Transamerica people." (J.A. at 637.) Orlando explained that FPA managed the in-person meetings with union members.[6] Orlando also stated that "Future Planning was the one that did all of the communication as far as the mail-outs to the homes [and] the solicitation." (J.A. at 639.) In fact, Hall concedes that, other than with Pescetelli, he never double-checked any of the information related to the policy with any source, including Silkes. Thus, TWU, Hall and Orlando apparently relied almost entirely on FPA, which was not an impartial analyst.

Independent expert advice is not a "whitewash," *Bierwirth*, 680 F.2d at 272, and it does not provide a complete defense to the allegation that plan administrators neglected their

---

QUESTION:    Who does he report to?

ORLANDO:    You'd have to ask him.  I think—I don't know.

(J.A. at 637.)  This exchange further demonstrates FPA's unexplained role in the process.  It is hard to imagine that Orlando justifiably relied on counsel from an advisor responsible to someone—worse, an unknown party—other than Orlando himself.

[6] Orlando testified that "the FPA had their representatives going to the various locales and conducting meetings either in the union halls or on the property."  (J.A. at 639.)

responsibilities, *see Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir. 1983). "An independent appraisal is not a magic wand that fiduciaries may simply waive over a transaction to ensure that their responsibilities are fulfilled." *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983); *see also Howard*, 100 F.3d at 1489, *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434-36 (3d Cir. 1996); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir. 1994); *Mazzola*, 716 F.2d at 1234. Fiduciaries are ultimately responsible for making a careful and perspicacious choice. *Bussian*, 223 F.3d at 301 (explaining that fiduciaries may not "rely blindly" on advice); *In re Unisys.*, 74 F.3d at 435-36 ("[W]e believe that ERISA's duty to investigate requires fiduciaries to review the data a consultant gathers, to assess its significance and to supplement it where necessary."); *Katsoaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) ("A trustee's lack of familiarity with investments is no excuse: under an objective standard trustees are to be judged 'according to the standards of others "acting in a like capacity and familiar with such matters."'") (citation omitted); *Withers v. Teachers Retirement Sys.*, 447 F.Supp. 1248, 1254 (S.D.N.Y. 1978), *aff'd mem.*, 595 F.2d 1210 (2d Cir.1979) ("In the area of investment decisions, the obligation to exercise prudence [includes] an obligation to . . . make independent inquiry into the merits of particular investments rather than to rely wholly on the advice of others.").

As noted above, both Orlando and Hall relied primarily on FPA. Hall, TWU's President, did not learn of the group policy's termination provision or its fifty-insured minimum until his deposition. Hall concedes he never bothered to read the policy. Fiduciaries need not become experts in employee benefits, and may rely on independent expert advice, but requiring that a fiduciary read the policy he signs and that he have a basic understanding of its most important provisions does not ask too much.

### IV.

The district court also determined that Defendants did not breach their duty of loyalty. Plaintiffs argue Defendants either lied about or omitted material information regarding (1) the size of possible premium increases and the possibility that benefits would decrease with age; (2) Transamerica's right to terminate the plan; and (3) the requirement that the plan maintain at least fifty enrollees.

As one would expect, "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in § 404(a)(1)." *Peoria Union Stock Yards Co. Retirement Plan v. Penn. Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983). A fiduciary also may not materially mislead beneficiaries. *Varity Corp. v. Howe*, 516 U.S. 489, 505 (1996). We have explained that "a misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision in pursuing . . . benefits to which she may be entitled." *Krohn v. Huron Memorial Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999) (citing *In re Unisys*, 57 F.3d at 435-36). Significantly, "a fiduciary breaches its duties by materially misleading plan participants, regardless of whether the fiduciary's statements were made negligently or intentionally." *Id.* at 547 (citing *Berlin*, 858 F.2d at 1163-64).

Defendants make two arguments. First, Defendants argue that all of the relevant information "was contained in the Group Master Policy, available to the union members for the asking." (Defendants' Brief at 14.) Although each individual policyholder's certificate explained the insured's right to inspect the Group Master Policy during normal business hours, this does not constitute "disclosure" in any meaningful sense because Transamerica kept its copy in New York and TWU retained the union's copy in Dallas. (J.A. at 358.) When deposed by Defendants' counsel, Paul Winkler complained:

QUESTION:     Well, you understand that you'd have the right to inspect the Group Master Policy, didn't you?

WINKLER:     I'm supposed to go to New York during their normal business hours?

(J.A. at 535-36.) A fiduciary has not satisfied his responsibilities by disseminating information in a manner not reasonably calculated to reach beneficiaries.

Defendants' second argument warrants more extensive attention. ERISA distinguishes between *pension plans* and *welfare plans*. A pension plan "provides retirement income to employees" or "results in a deferral of income by employees for periods extending to the termination of . . . employment or beyond." 29 U.S.C. § 1002(2). Unlike pension plans, welfare plans include those "established or . . . maintained for the purpose of providing . . . medical, surgical or hospital care or benefits." *Id.* at § 1002(1). Life insurance plans qualify as welfare plans. *Metro. Life Ins. Co. v. Bigelow*, 283 F.3d 436, 440 n.3 (2d Cir. 2000); *Filipowicz v. Am. Stores Benefit Plans Comm.*, 56 F.3d 807, 815 (7th Cir. 1995); *Brandon v. Travelers Ins. Co.*, 18 F.3d 1321, 1324 (5th Cir. 1994).

As a matter of law under ERISA, one of the key differences between welfare and pension plans is that welfare plan benefits do not vest. 29 U.S.C. §§ 1051, 1084; *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1377 (6th Cir. 1994). Consequently, plan administrators may modify a welfare plan's terms at any time, whether or not the employer or union reserved the right to do so. *See, e.g.*, *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996) (citing *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)); *Helwig v. Kelsey-Hayes Co.*, 93 F.3d 243, 248 (6th Cir. 1996). As Defendants correctly note, fiduciary duties do not apply to the amendment or termination of an unfunded, contingent benefit

plan. *Pope v. Cent. States Southeast and Southwest Areas Health & Welfare Fund*, 27 F.3d 211, 212 (6th Cir. 1994); *Sutter v. BASF Corp.*, 964 F.2d 556, 562 (6th Cir. 1992); *Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 947 (6th Cir. 1990).

At this point, however, Defendants make a leap unsupported by ERISA or case law by arguing that because fiduciary duties do not apply to the amendment or termination of a welfare plan, "a plan administrator need not disclose the fact that an employee welfare benefit plan is subject to amendment or termination." (Defendants' Brief at 14.) This is only true if plan administrators are not otherwise providing beneficiaries with information. Defendants cite *Sprague v. Gen. Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) (en banc), in which this Court interpreted, *inter alia*, ERISA's disclosure provisions contained in 29 U.S.C. § 1022(b). Several decisions from other circuits appear to support Defendants' position; for instance, in *Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 935 (5th Cir. 1993), the Fifth Circuit wrote that "[s]ection 1022(b) relates to an individual employee's eligibility under then existing, current terms of the Plan and not to the possibility that those terms might later be changed, as ERISA undeniably permits." *See also Jensen v. SIPCO, Inc.*, 38 F.3d 945, 952 (8th Cir. 1994) (citing *Wise*); *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 858 (4th Cir. 1994) (citing *Wise*). Like these cases, *Sprague* considered whether a plan administrator must provide unrequested information, not whether an administrator may mislead when providing information. *See Sprague*, 133 F.3d at 406; *Jensen*, 38 F.3d at 952; *Gable*, 35 F.3d at 858; *Wise*, 986 F.2d at 935.

*Sprague* involved a putative class of retirees who brought an action against General Motors alleging that the company improperly modified a health care plan that would have provided the beneficiaries with free lifetime basic health coverage. 133 F.3d at 389-91. The plaintiffs argued, among several things, that General Motors breached its fiduciary

duty by failing to disclose that it could amend or terminate the plan. *Id*. at 405-06. Defendants are correct that this Court held "GM was not required to disclose in its summary plan descriptions that the plan was subject to amendment or termination." *Id*. at 405. This Court wrote:

> We are not aware of any court of appeals decision imposing fiduciary liability for failure to disclose information that is not required to be disclosed. *A fortiori*, there can be no fiduciary duty to disclose the *possibility* of a future change in benefits. *Had an early retiree asked about the possibility of the plan changing, and had he received a misleading answer, or had GM on its own initiative provided misleading information about the future of the plan . . . a different case would have been presented.* But we do not think that GM's accurate representations of its current program can reasonably be deemed misleading. GM having given out no inaccurate information, there was no breach of fiduciary duty.

*Id*. at 406 (citations omitted) (first emphasis of "possibility" in original; other emphasis added). To reiterate, "[h]ad an early retiree asked about the possibility of the plan changing," or "had GM on its own initiative provided misleading information," the fiduciary would have had a responsibility to provide a non-misleading answer. *Id*.

In this regard, our subsequent decision in *Krohn v. Huron Memorial Hospital*, 173 F.3d 542 (6th Cir. 1999), developed *Sprague* further. *Krohn* involved a permanently disabled plaintiff who claimed she lost the opportunity to secure long-term disability benefits because the defendant, her prior employer, breached its fiduciary duty under ERISA. *Id*. at 545. The defendant never notified the plaintiff about available long-term disability benefits despite her husband's general requests for information about the availability of disability benefits for his wife. *Id*. at 548. We held that "once an ERISA beneficiary has requested information from

an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, *even if that requires conveying information about which the beneficiary did not specifically inquire.*" *Id.* 547 (emphasis added); *see also In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434-36 (3d Cir. 1996) (holding that Unisys breached its fiduciary duty where it "affirmatively and systematically represented to its employees that once they retired, their medical benefits would continue for life—even though as the district court concluded in rejecting the retirees' contract claim, the plans clearly permitted the company to terminate benefits"); *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir.1993) (finding fiduciary duty to communicate material facts affecting interests of beneficiaries "exists when a beneficiary asks fiduciaries for information, and even when he or she does not"); *Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747, 750 (D.C. Cir.1990) ("At the request of a beneficiary (and in some circumstances upon his own initiative), a fiduciary must convey complete and correct material information to a beneficiary.").

Following this course, we recently decided *James v. Pirelli Amstrong Tire Co.*, 305 F.3d 439 (6th Cir. 2002). *Pirelli Armstrong* involved an employer that, on its own initiative, provided materially misleading and inaccurate information to the plaintiffs in group meetings designed to convey information about benefits. *Id.* at 443. The employer's human resources representative also provided materially misleading and inaccurate information when she indicated to employees that the employer could not change their benefits during retirement. *Id.* The employer argued that some plaintiffs did not inquire about their benefits, but we held that "it is not necessary that employees ask specific questions about future benefits or that they take the affirmative step of asking questions about the plan to trigger the fiduciary duty." *Id.* at 454. Rather, we stressed that a "breach of fiduciary duty occurs when the employer or plan administrator on its

own initiative provides misleading information about the future benefits of a plan." *Id.*

Turning to the specific facts this case presents, Plaintiffs participated in question-and-answer sessions in which, obviously, Plaintiffs questioned Defendants and their representatives about the policy. Plaintiff Gregg testified that "questions were being asked" at these sessions. (J.A. at 433.) Plaintiff Paul Winkler also testified:

QUESTION: Did you personally ask questions at the meeting?

WINKLER: Yes.

QUESTION: Tell me some of the things that you recall being interested in that led you to ask some questions.

WINKLER: I asked questions pertaining to will the premium ever go up, number one. The answer was the premium is guaranteed for three years. And if it does go up, it will only be a matter of a couple pennies. How long is the policy good for? Policy is good forever until you die. Is it decreasing insurance? No. Are the premiums based upon your age? No. And to verify it, they gave us a hotline to call, which I most certainly did.

(J.A. at 531.) Thus, Plaintiffs have adduced testimony that they asked questions.

Defendants distributed bulletins encouraging union members to consider a policy with "a flat rate premium that would not increase with age." (J.A. at 516, 517.) Defendants' question-and-answer sheet unequivocally states,

"Question - Can the monthly flat rate for the TWU OTP Plan increase because of age? Answer - No." (J.A. at 521.) According to Paul Winkler's testimony, in direct response to his questions, Defendants (or their representatives) told union members that the policy would not base premiums on age, that the premiums would not increase by more than pennies, and that benefits would not decrease over time. We have held that "[a] fiduciary must give complete and accurate information in response to participants' questions." *Drennan v. Gen. Motors Corp.*, 977 F.2d 246, 251 (6th Cir. 1992); *accord Electro-Mechanical Corp. v. Ogan*, 9 F.3d 445, 451 (6th Cir. 1993) ("ERISA imposes a duty upon fiduciaries to respond promptly and adequately to employee-initiated inquiries regarding the plan or any of its terms."). Each of Defendants' answers to Paul Winkler's questions, however, was extraordinarily misleading or outright false. Therefore, Defendants' answers violated the requirements of *Sprague*, *Krohn*, and *Pirelli*. *See Pirelli*, 305 F.3d at 454; *Krohn*, 173 F.3d at 547; *Sprague*, 133 F.3d at 406.

Defendants also suggested that Transamerica could not cancel the policy. According to the question-and-answer sheet Defendants distributed:

QUESTION:    Can I continue my TWU OTP Plan after retirement at the same monthly flat rate?

ANSWER:      Yes. The TWU OTP Plan can be continued *indefinitely* after retirement at the same monthly rate.

(J.A. at 521) (emphasis added). As recounted above, Paul Winkler described this exchange from one of the information sessions: "How long is the policy good for? Policy is good forever until you die." (J.A. at 531.) Actually, Transamerica could terminate the policy at any time after three years, with appropriate notice. Defendants had a duty to honestly respond to questions about the plan's termination provisions.

*See, e.g.*, *Abbruscato v. Empire Blue Cross & Blue Shield*, 274 F.3d 90, 103 (2d Cir. 2001) ("Even if, on remand, the trier of fact determines that there was no promise to vest the life insurance benefits, Empire may have still violated any fiduciary duties in its retiree letters and other communications which promised lifetime benefits but failed to note that Empire could reduce or terminate these benefits at any time."); *Electro-Mechanical*, 9 F.3d at 451; *Drennan*, 977 F.2d at 251.

Defendants also never informed Plaintiffs that the Transamerica Group Master Policy required that at least fifty people participate for the insurance coverage to continue. This important piece of information is material to potential participants evaluating a life insurance program and the plan administrators should have disclosed it in response to Plaintiffs' questions concerning the conditions and circumstances under which Transamerica could cancel insurance coverage. Although no Plaintiff ever asked whether the policy required a minimum number of insureds, it is irrelevant that no one asked the precise question because once an ERISA fiduciary begins affirmatively providing information not required by statute, the fiduciary may not mislead, even if this means disclosing information that the fiduciary would not otherwise need to disclose.

ERISA imposes trust-like fiduciary responsibilities, *see Varity*, 516 U.S. at 496, and a trustee "is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person." RESTATEMENT (SECOND) OF TRUSTS § 173, cmt. d (1959). For this reason, "once an ERISA beneficiary has requested information from an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, *even if that requires conveying*

*information about which the beneficiary did not specifically inquire.*" *Krohn*, 173 F.3d at 547 (emphasis added); *see also In re Unisys Corp.*, 57 F.3d at 1264 (holding that Unisys breached its fiduciary duty where it "affirmatively and systematically represented to its employees that once they retired, their medical benefits would continue for life—even though as the district court concluded in rejecting the retirees' contract claim, the plans clearly permitted the company to terminate benefits"); *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir.1993) (fiduciary duty to communicate material facts affecting interests of beneficiaries "exists when a beneficiary asks fiduciaries for information, and even when he or she does not"); *Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747, 750 (D.C. Cir.1990) ("At the request of a beneficiary (and in some circumstances upon his own initiative), a fiduciary must convey complete and correct material information to a beneficiary."). By not explaining the Group Master Policy's minimum participation requirement, Defendants did not provide full and complete information.

Defendants thus misled Plaintiffs with respect to the size of possible premium increases and the possibility that benefits would decrease with age, Transamerica's right to terminate the plan, and the requirement that the plan maintain at least fifty enrollees. Defendants had an affirmative obligation to provide Plaintiffs with this material information whether or not they asked for it. *See, e.g.*, *Pirelli Armstrong*, 305 F.3d at 454; *Krohn*, 173 F.3d at 547. The fact that Plaintiffs *did* request disclosure of this material information renders Defendants' violations of *Pirelli Armstrong* and *Krohn* all the more apparent. *See Pirelli Armstrong,* 305 F.3d at 454; *Krohn*, 173 F.3d at 547.

## V.

Plaintiffs have raised a genuine issue of material fact as to whether Defendants breached their fiduciary duty by abandoning their responsibilities, overly relying on an untrustworthy advisor, and misleading beneficiaries. For all the aforementioned reasons, we **REVERSE** the decision of district court.

————————

## CONCURRENCE

————————

ALICE M. BATCHELDER, Circuit Judge, concurring in the result only. I concur in the result reached by the majority because I believe that the plaintiffs have set forth just enough evidence to require that a trier of fact determine whether the Defendants breached their duty with respect to the potential change in the amount of the premiums. However, for several reasons I cannot simply concur in the opinion. First, I believe the majority opinion distorts the facts, particularly with regard to the Defendants' reliance on experts in selecting the plan. Second, even if the majority's factual picture in that respect were accepted as being correct, the majority's creation of a new requirement that a fiduciary may not rely on expert advice unless the fiduciary himself has read everything that he signs, regardless of the complexity of the document, the expertise—or lack of expertise—of the fiduciary, or the degree of expertise of the experts or advisors on whom the fiduciary relies to evaluate the document for him, is imprudent and without legal precedent.

Finally, and perhaps most importantly, I believe the majority opinion extends this circuit's cases of *Sprague v. General Motors Corp*, 133 F.3d 388 (6th Cir. 1998), *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542 (6th Cir. 1999), and *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439 (6th Cir. 2002), beyond their rational application in all respects except with regard to the information disseminated about the potential change in premium amounts. These cases stand for the limited proposition that, if the fiduciary is providing information on its own initiative, then it must not make any materially misleading statements; but if it is responding to inquiry, it must provide accurate and complete information that bears in mind the needs of the particular beneficiary. Ranging far afield of these limited rules, the majority opinion appears to add to an ERISA fiduciary's duties in an area already highly regulated by Congress and the Department of Labor, and gives no clear guidance as to what fiduciaries in this circuit must disclose to potential plan beneficiaries. Accordingly, I concur only in the result reached by the majority.