# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-1901

DEBRA K. KEACH and
PATRICIA A. SAGE,

*Plaintiffs-Appellants,*

*v.*

U.S. TRUST COMPANY, formerly
known as U.S. Trust Company of
California N.A.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 01 C 1168-—**Michael M. Mihm**, *Judge.*

_____

ARGUED DECEMBER 10, 2004—DECIDED AUGUST 17, 2005

_____

Before RIPPLE, MANION and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Debra Keach and Patricia Sage,
participants in the Foster & Gallagher, Inc. Employee Stock
Ownership Plan ("ESOP"), filed this action against U.S.
Trust Company, N.A. ("U.S. Trust") and others for alleged

violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., in connection with the ESOP's December 20, 1995 purchase of shares of Foster & Gallagher, Inc. ("F&G") stock from the defendant F&G officers and directors. The district court conducted a fourteen-day bench trial and then entered judgment in favor of U.S. Trust. Ms. Keach and Ms. Sage now appeal from that decision. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A.  Facts

The facts of this case are, for the most part, undisputed.[1] F&G was a direct mail marketing company engaged in the marketing of gifts, housewares and novelty items. Over time, F&G acquired several companies, many of which marketed horticultural products through the mail. The F&G ESOP began in 1988, when it purchased about thirty percent of F&G's stock from the company's founders. In 1995, after Thomas Foster, CEO and Chairman of the F&G board of directors, became terminally ill, a leveraged purchase of a large number of F&G shares by the ESOP was proposed. At that time, F&G had been enjoying record profitability for several years and was forecasted to continue this trend into the future. On December 20, 1995, the ESOP, with U.S. Trust acting as its trustee, purchased 3,589,743 shares of F&G stock from several F&G officers and directors at a price of

---

[1] The district court's opinion contains an extensive plenary review of the facts in this case. *See Keach v. U.S. Trust Co., N.A.*, 313 F. Supp. 2d 818 (C.D. Ill. 2004). This summary sets forth those facts relevant to the parties' contentions on appeal.

$19.50 per share (the "ESOP II transaction"). For the next two years, F&G did enjoy record business; however, in 1998, its profits began to decline steadily until F&G declared bankruptcy in 2001. Ms. Keach and Ms. Sage filed this action in April 2001 after the value of F&G shares had reached less than fifty percent of their original purchase price.

### 1. Michigan Bulb Company

In 1995, F&G's largest subsidiary was Michigan Bulb Company ("MBC"), a direct mail marketer of horticultural products. MBC conducted direct mail sweepstakes promotions to its customers primarily in three different formats: (1) an "everybody wins" sweepstakes, in which every person who returned an entry form won a "special prize," regardless of whether or not they placed an order; (2) a base sweepstakes that awarded a total of $250,000 annually and had a grand prize of $100,000; and (3) a pre-selected giveaway, in which the winners were determined before the mailing.

In 1991, MBC retained an attorney, John Awerdick, a specialist in advertising law and sweepstakes issues, to review its mailings for compliance with the law. Initially, Awerdick advised MBC that the laws of nine states could be read to prohibit the "everybody wins" type of promotions, and he advised that states increasingly were using prize and gift laws to regulate sweepstakes. In the attorney's view, the level of risk to MBC was difficult to assess because the laws were not enforced strictly. By the spring of 1992, MBC had established a practice of having Awerdick review each new proposed promotion; if he advised MBC not to send out a particular mailing, the mailing was not sent.

On February 23, 1994, and February 22, 1995, Awerdick

provided letters to F&G's outside auditor, Price Waterhouse, in which he discussed trends in the regulation of sweepstakes. The 1994 letter noted:

> Increasingly, states are using consumer protection laws to regulate sweepstakes further. In particular, a number of states are regulating some promotions in which every recipient of a mailing is advised that he or she is a prize winner. Many of the Company's mailings include such a statement. Generally, either through statutory language or as a matter of prosecutorial discretion, these "gift and prize" laws are being applied against businesses using "900" telephone numbers, offering time shares, vacation homes and camp sites, or requiring attendance at a sales presentation to receive a prize. I know of no current attempts to enforce these laws against traditional conventional direct mail sweepstakes operators. However, the Company would be required to make fundamental changes in many of its mailings if a "prize and gift" statute were applied to the "everybody wins" element of its promotions. Michigan Bulb's management has been advised of the risks of these state statutes.

R.271, Ex.186. The 1995 letter contained substantially similar language to that quoted directly above, except that it deleted the sentence, "I know of no current attempts to enforce these laws against traditional conventional direct mail sweepstakes operators," because MBC had received an inquiry about its sweepstakes from the Attorney General of North Carolina. Although Awerdick informed MBC of these risks, he never advised MBC to stop using "everybody wins" promotions. Nor did he ever advise MBC that any changes required to bring its sweepstakes into compliance with the state laws would have a significantly adverse

impact on MBC's financial situation.

MBC received thousands of inquiries each year from state attorneys general ("state inquiries"), better business bureaus, action lines and others about its promotions. In and before December 1995, MBC had responded to inquiries from the attorneys general of eight states. Dale Fujimoto, MBC's senior vice president of marketing, testified that such inquires were viewed as part of the routine of the direct mail order business and were not considered a source of concern. None of the state inquiries resulted in an enforcement action against MBC or otherwise had material adverse consequences on MBC. At trial, U.S. Trust's expert Stephen Durchslag, an attorney with thirty-seven years' experience in the field of promotions and advertising law, including sweepstakes, testified that the legal environment surrounding sweepstakes in 1995 was favorable and that he and other sweepstakes experts would have considered these type of inquiries to be normal and not an indication that MBC was at risk of significant regulatory or enforcement problems.

### 2. ESOP II Transaction

F&G retained Valuemetrics, Inc. ("Valuemetrics") as its financial advisor to help structure the proposed ESOP II transaction. On September 30, 1995, Valuemetrics issued its first transaction memorandum to the F&G board of directors describing a proposed offer to sell 2,916,667 shares to the ESOP at $24 per share.

U.S. Trust served as an independent trustee for the ESOP to consider the merits of the proposed transaction. U.S. Trust, in turn, engaged Houlihan, Lokey, Howard & Zukin ("Houlihan") to assist it in valuing the transaction and to render a written opinion to U.S. Trust as to whether the transaction was fair to the ESOP from a financial

perspective. On October 17, 1995, Norman Goldberg and Michael Shea of U.S. Trust and Martin Sarafa and Todd Strassman of Houlihan met with F&G executives to perform corporate due diligence for the stock transaction. At that meeting, Goldberg of U.S. Trust also spoke with Robert Ostertag, president of MBC at the time, about MBC and its sweepstakes promotions. At the October 17 meeting: (1) Ostertag did not identify government regulation of sweepstakes as a risk; (2) no F&G representative identified either the primary role of sweepstakes to MBC's business or possible government regulation of sweepstakes as a risk; and (3) there was no discussion of MBC's dependency on sweepstakes being a negative, of the pending state inquiries or of state laws that regulated MBC's sweepstakes marketing. Shea also toured the MBC facilities and spoke with additional members of MBC's management. Testimony from F&G officers, found to be credible by the district court, indicated that state regulation and sweepstakes issues were not considered to be material factors in the ESOP II transaction at any time.

Around this same time, B.A. Securities, a subsidiary of the Bank of America corporation, conducted its own due diligence of F&G and issued a private placement memorandum for potential lenders into the prospective ESOP II transaction. The memorandum did not identify sweepstakes as an inherently risky promotional tool or identify any legal or regulatory risk. By November 20, 1995, four institutional lenders, in combination, were willing to loan F&G the requested $70 million on favorable terms for the ESOP II transaction.

After its inquiries into F&G and MBC, Houlihan prepared an analysis for U.S. Trust of F&G financials with respect to the offer price of $24 per share. Based on Houlihan's anal-

ysis, U.S. Trust determined that Valuemetrics' analysis was too optimistic in some respects. Houlihan prepared a new analysis reflecting a lower valuation range for the price of the F&G shares. On November 7, 1995, U.S. Trust suggested a share price of $18.50; F&G officers rejected the offer and negotiations broke off. Negotiations later resumed, and, on November 29, 1995, U.S. Trust announced that it was willing to recommend that the ESOP purchase a controlling block of F&G shares at $19.50 per share, subject to further due diligence by U.S. Trust.

On December 19, 1995, Houlihan presented a report to U.S. Trust concluding that the midpoint value of the F&G stock was $19.81 per share at the time. In preparing this fairness opinion, Houlihan did not know what percentage of MBC's sales were generated by sweepstakes, did not know what MBC's primary sweepstakes approaches were and did not know of any regulatory inquiries or risks associated with MBC's sweepstakes.

To perform due diligence for the proposed ESOP II transaction, U.S. Trust retained the law firm of Sonnenschein, Nath & Rosenthal ("Sonnenschein"). At U.S. Trust's request, Sonnenschein did not begin significant due diligence until early December 1995. On December 12, 1995, Sonnenschein faxed to F&G's outside corporate counsel a list of the documents to be gathered for due diligence review. Among the documents requested were copies of any significant correspondence with any regulatory agencies. An attorney with Sonnenschein traveled to F&G and discussed each item on the due diligence request list with F&G's corporate controller. The attorney made general inquiries into pending legal matters, but he did not ask for any specific document, such as the letters of inquiry from the states attorneys general or MBC's response to those inquiries. The attorney did not speak to Awerdick and did not see Awerdick's audit

response letters to Price Waterhouse.

On December 18, 1995, the attorney met with the Sonnenschein partner responsible for the legal due diligence. The attorney did not prepare a written report of his due diligence investigation. He testified that he had reported finding nothing significant in his review, but that he did not recall discussing MBC's sweepstakes marketing with the partner. The partner no longer is with Sonnenschein and could not be located to testify in this case. No record exists documenting that the partner analyzed MBC's sweepstakes business or the state inquiries but decided that those issues were not material. The record likewise is devoid of evidence of the substance of any communications between U.S. Trust and the Sonnenschein due diligence counsel.

There appears to be no dispute that Sonnenschein did not provide U.S. Trust with copies of the documents that the attorney had received, including Awerdick's February 1995 audit response letter advising that MBC would have to make fundamental changes in its mailings if state prize and gift laws were enforced, and an October 19, 1995 memorandum contained in the F&G board book for that month noting that MBC had received inquiries from three states in two weeks in October 1995. Goldberg of U.S. Trust testified that, if he had seen those two documents, he would have asked for a further explanation from the company. When the ESOP II transaction closed on or before December 20, 1995, Goldberg had only a general understanding of MBC's sweepstakes marketing program and had not focused specifically on "everybody wins" type promotions. He also did not know that between eighty to eighty-five percent of MBC's sales were generated through sweepstakes marketing.

### 3. Post-Closing Occurrences

For two years after the ESOP II transaction on

December 20, 1995, F&G continued to enjoy record profits. In July 1996, the Attorney General of Connecticut filed lawsuits challenging the sweepstakes practices of fifteen companies including MBC. In February 1997, the Attorney General of Vermont opened an investigation into MBC's sweepstakes promotions. MBC resolved both matters in the summer of 1998 by entering into assurances of discontinuance, in which MBC paid a total of $70,500 in costs and agreed to certain injunctive relief. In October 1997, MBC entered into an assurance of discontinuance with the Attorney General of Michigan. By October 1997, MBC decided that only non-"everybody wins" versions of its promotions would be sent to consumers in states that had strict laws concerning such promotions. MBC projected a six and one-half percent decrease in sales for the spring of 1998. By 1998, MBC had stopped using "everybody wins" promotions in eleven states and was proceeding to modify its business in order to comply with the laws in all states.

The stock purchase agreements through which the participants in the Executive Investment Plan ("EIP") reinvested the proceeds from the ESOP II transaction included an annual provision allowing EIP participants to sell back all or some of their shares to F&G. In 1997, F&G's board of directors offered the ESOP the opportunity to purchase the vested shares available under the EIP agreements. A number of F&G officers chose not to participate in the transaction because they believed that the stock's value would continue to increase. Also in 1997, F&G became a Subchapter S corporation. This arrangement allowed it to avoid paying taxes on a substantial portion of any profits, but did not allow the company to take a tax deduction for business losses. Also during 1997, a purchase by the ESOP of the remaining F&G shares at $25 per share was proposed. Two major shareholders, the Foster Estate and Melvyn Regal, refused to sell their shares because they believed the

price to be low.

In February 1998, several news stories appeared focusing on the sweepstakes practices of American Family Publishing and Publisher's Clearinghouse. Although MBC did not use many of the practices at issue in the news reports, the negative publicity about sweepstakes in general caused an immediate and dramatic decline in MBC's consumer response rates. The negative publicity spurred class actions and multi-state enforcement actions against other direct mail marketers, which further fed the anti-sweepstakes sentiment. According to U.S. Trust's expert, Durchslag, the striking change in the regulatory enforcement climate that followed the public backlash was not expected by sweepstakes professionals. A number of former MBC and F&G officials testified uniformly that they believed the principal cause of MBC's economic reversal was this negative media coverage. In 2001, F&G and its subsidiaries filed for bankruptcy.

## B. District Court Proceedings

Ms. Keach and Ms. Sage alleged that U.S. Trust breached a fiduciary duty owed under ERISA when, in determining the purchase price for the F&G stock, it failed to assess fully the risks associated with MBC's use of sweepstakes promotions. This lack of a complete and good faith inquiry, Ms. Keach and Ms. Sage contended, meant that the ESOP II transaction was not for "adequate consideration" and, consequently, did not come within a statutory exemption from the prohibited transaction restrictions of ERISA. *See* 29 U.S.C. §§ 1106(a)(1)(A), 1108(e). However, the district court concluded that the ESOP II transaction met the definition of adequate consideration and, therefore, was not prohibited by ERISA. In the alternative, the district court held that,

even if U.S. Trust had breached a fiduciary duty, no remedy was appropriate because any such breach had not caused the losses to the ESOP.

## 1.

In deciding that U.S. Trust was entitled to the adequate consideration exemption of ERISA section 408, 29 U.S.C. § 1108, the district court recognized that U.S. Trust had the burden to prove two elements: (1) that the ESOP paid the fair market value for the asset, (2) as determined in good faith by the trustee. The district court found that the ESOP had paid fair market value for the F&G stock based on three expert evaluations that reported that the per share price in 1995 was well more than $19.50. The district court found these evaluations to be more credible than a report valuing the shares at less than $19.50 per share.

The district court next determined that U.S. Trust had conducted a sufficient investigation into the merits of the ESOP II transaction. Specifically, the court found that neither MBC's dependency on sweepstakes nor the increase in governmental regulation of the sweepstakes industry posed a material risk to F&G in 1995 or a foreseeable material risk in the future:

> [T]he weight of the evidence indicated that F&G's officers and directors did not consider these issues to be material at the time, as evidenced by the following: (1) an otherwise inexplicable conversion to a Subchapter S corporation in 1997 (which would only have had positive tax consequences for a company expecting continued profitability); (2) the undersubscription of another stock purchase transaction by the ESOP in 1997 because many officers and directors believed that the stock was worth much more and would continue to

increase in value; (3) the immediate refusal of Foster and Regal to sell their remaining shares to the company at $25.00 per share in 1997; and (4) an unsecured $10 million loan from Regal and the Foster Estate to F&G in 1999 in order to assist the recovery of the company. Nor were such issues deemed material by the four lenders that performed their own due diligence investigation prior to loaning F&G $70 million to finance the 1995 stock purchase transaction at favorable interest rates and without requiring collateral. Some of these same lenders agreed to loan an additional $100 million on the same terms in 1997. Uncontroverted and credible testimony at trial from an industry expert [Durchslag] also established that such issues were not material at the time of the 1995 stock purchase transaction and did not present a reasonably foreseeable material risk of future harm to F&G.

R.618 at 2-3.

In addition, the district court discussed two specific components of U.S. Trust's investigation into the merits of the transaction: the valuation of the purchase price and the legal due diligence. The court ruled that U.S. Trust reasonably relied on Houlihan's opinion as to fairness of the $19.50 purchase price for the F&G shares. The court noted that U.S. Trust and Houlihan had analyzed exhaustively F&G's financials, had conducted independent valuation analyses and had challenged the financial forecasts made by F&G management as too optimistic. However, the district court determined that U.S. Trust had not appropriately relied upon the legal due diligence review performed by Sonnenschein. Specifically, the court found troubling the absence in the record of any meaningful communications regarding legal due diligence between Sonnenschein and U.S. Trust. The court believed that this lack of a record did

not allow it to find that U.S. Trust's counsel was aware of MBC's extensive use of sweepstakes marketing and of the state inquiries. Nevertheless, the court concluded that these were not important issues. The district court therefore concluded that the inadequate legal due diligence did not mean that the ESOP II transaction was not for adequate consideration:

> Had there been further investigation into the sweepstakes inquiries, the uncontroverted evidence of record indicates that U.S. Trust would have discovered that none of the state attorney general inquires received by MBC prior to December 20, 1995, had resulted in any enforcement action or negative consequences to the company and that the inquiries pending at that time were expected to be resolved in the normal course of business without any material consequences. While sweepstakes marketing was beginning to receive a higher degree of scrutiny from governmental regulatory agencies, and therefore posed the possibility of a greater likelihood of enforcement through consumer protection laws, the evidence presented at trial indicated that 1995 was a "quiet" period in the industry from a regulatory perspective.

> Defendants' expert Durchslag testified that experts in sweepstakes law would not have considered the few state inquiries received by MBC in 1995 to be material or a sign of significant impending regulatory problems. Accordingly, there is no basis for the assertion that consideration of sweepstakes risk by a prudent investor would have reduced the value of F&G stock or caused a prudent investor not to engage in the ESOP II transaction at all. The fact that U.S. Trust and its legal advisor did not identify a risk that the Court finds was not material cannot be considered evidence of an imprudent

or bad faith investigation for purposes of precluding an otherwise applicable exemption under § 408(e).

*Id.* at 93-94.

## 2.

In the alternative, the district court determined that, even if U.S. Trust had breached a fiduciary duty, it was not liable for damages because the losses to the ESOP were not caused by any such breach. The court took the view that

> [t]he portion of the corporate legal due diligence that was either overlooked or undocumented, namely the regulatory inquiries made by state attorneys general into MBC's sweepstakes marketing practices and the risk of sweepstakes dependency, was not a material consideration with respect to the propriety of the ESOP II transaction and posed no actual or reasonably foreseeable material risk to F&G at the time of the 1995 transaction. There is no credible evidence of record establishing that any different actions by U.S. Trust would have had any impact on the outcome of the ESOP II transaction.

*Id*. at 101-02. Furthermore, the district court determined that the record demonstrated that the actual cause of the loss to the ESOP was the collapse in customer response rates that started in 1998 after the wave of negative press surrounding the American Family Publishers Company scandal. The loss to the ESOP, accordingly, was not due to any meaningful risk to the profits of F&G from MBC's dependency on sweepstakes promotions or from governmental regulation of sweepstakes.

## II

## ANALYSIS

### A. Standard of Review

We review a district court's conclusions of law de novo, and we review its findings of fact, as well as applications of law to those findings of fact, for clear error. *Eyler v. Comm'r of Internal Revenue*, 88 F.3d 445, 448 (7th Cir. 1996). We review a district court's decision to permit expert testimony for an abuse of discretion. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

### B. ERISA and the ESOP II Transaction

Section 406 of ERISA prohibits a fiduciary of an ERISA plan from causing the plan to enter into certain transactions with a "party in interest." 29 U.S.C. § 1106.[2] Section 406

---

[2]  The transactions prohibited by section 406(a) include:

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; or

(continued...)

supplements an ERISA fiduciary's general duties of loyalty and prudence to the plan's beneficiaries, as set forth in section 404, 29 U.S.C. § 1104,[3] "by categorically barring

---

[2] (...continued)

> (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

> (2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107(a) of this title.

29 U.S.C. § 1106(a).

[3] Section 404(a)(1) provides in part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

> (A) for the exclusive purpose of:

>> (i) providing benefits to participants and their beneficiaries; and

>> (ii) defraying reasonable expenses of administering the plan;

> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

> . . . .

> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a)(1). Section 404 also includes a general re-

(continued...)

certain transactions deemed 'likely to injure the pension plan.' " *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241-42 (2000) (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160 (1993)). A plan need not suffer an injury in order for a court to find a transaction prohibited by section 406. *Etter v. J. Pease Constr. Co.*, 963 F.2d 1005, 1010 (7th Cir. 1992).

It is undisputed in this case that the ESOP II transaction, a purchase of F&G stock by the ESOP from F&G officers and directors, was prohibited under ERISA section 406(a)(1)(A) as a "sale or exchange . . . of any property between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(A). However, section 408(e) of ERISA provides that the prohibitions in sections 406 and 407 of the statute shall not apply to the acquisition or sale of qualifying employer securities by an employee stock ownership plan if, among other conditions, the acquisition or sale is for "adequate consideration." *Id.* § 1108(e)(1).[4] For securities with no recognized market, as in

_____

(...continued)

quirement of diversification of plan assets, *id.* § 1104(a)(1)(C), but provides that the requirement is not violated by an investment in employer securities by an employee stock ownership plan, *id.* §§ 1104(a)(2), 1107(d)(5) & (6). *See Donovan v. Cunningham*, 716 F.2d 1455, 1464 n.14 (5th Cir. 1983).

[4] Section 408(e) provides:

Sections 1106 and 1107 of this title shall not apply to the acquisition or sale by a plan of qualifying employer securities (as defined in section 1107(d)(5) of this title) or acquisition, sale or lease by a plan of qualifying employer real property (as defined in section 1107(d)(4) of this title)—

(1) *if such acquisition, sale, or lease is for adequate consideration* (or in the case of a marketable obligation, at a
(continued...)

this case, ERISA defines "adequate consideration" to be "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." *Id.* § 1002(18)(B). In order to rely on the adequate consideration exemption, a trustee or fiduciary has the burden to establish that the ESOP paid no more than fair market value for the asset, and that the fair market value was determined in good faith by the fiduciary.[5] *See*

---

(...continued)

    price not less favorable to the plan than the price determined under section 1107(e)(1) of this title),

    (2) if no commission is charged with respect thereto, and

    (3) if—

        (A) the plan is an eligible individual account plan (as defined in section 1107(d)(3) of this title), or

        (B) in the case of an acquisition or lease of qualifying employer real property by a plan which is not an eligible individual account plan, or of an acquisition of qualifying employer securities by such a plan, the lease or acquisition is not prohibited by section 1107(a) of this title.

29 U.S.C. § 1108(e) (emphasis added).

[5] The Department of Labor ("DOL") issued a proposed rule in 1988 to clarify the definition of "adequate consideration." *See* Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17,632 (May 17, 1988) (to be codified at 29 C.F.R. § 2510-3(18)(b)). The DOL contemplated that adequate consideration has two distinct elements:

First, the value assigned to an asset must reflect its fair market value as determined pursuant to proposed § 2510.3-18(b)(2). Second, the value assigned to an asset must be the product of a determination made by the fiduciary in good

(continued...)

*Eyler*, 88 F.3d at 454-55.

In establishing that there has been compliance with the statutory mandate, "[t]he degree to which a fiduciary makes an independent inquiry is critical." *Id.* at 456. "Although securing an independent assessment from a financial advisor or legal counsel is evidence of a thorough investigation," it is not a complete defense against a charge of imprudence. *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996). A fiduciary must "investigate the expert's qualifications," "provide the expert with complete and accurate

---

[5] (...continued)
> faith as defined in proposed § 2510.3-18(b)(3). The Department will consider that a fiduciary has determined adequate consideration in accordance with section 3(18)(B) of the Act . . . only if both of these requirements are satisfied.

*Id.* at 17,633.

Although the proposed regulation has yet to be approved for publication in the Code of Federal Regulations, *see* Unified Agenda, Adequate Consideration, 69 Fed. Reg. 37,812-01 (June 28, 2004), this court and other courts of appeals have adopted this two-part standard for evaluating the adequacy of consideration. *See Eyler v. Comm'r of Internal Revenue*, 88 F.3d 445, 454-55 (7th Cir. 1996) (stating that a fiduciary can prove adequate consideration "by showing they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing"); *Chao v. Hall Holding Co.*, 285 F.3d 415, 436-37 (6th Cir. 2002); *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996); *Donovan*, 716 F.2d at 1467; *see also Henry v. Champlain Enters., Inc.*, 334 F. Supp. 2d 252, 269-70 & nn.7-8 (N.D.N.Y. 2004). *But see Herman v. Mercantile Bank, N.A.*, 143 F.3d 419, 421-22 (8th Cir. 1998) ("Even if a trustee fails to make a good faith effort to determine the fair market value of the stock, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyways." (internal quotation and citation omitted)).

information" and "make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Id.* (citing *Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir. 1983), and *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983)).

Ms. Keach and Ms. Sage submit that U.S. Trust failed to make the requisite good faith determination. They submit that, contrary to the district court's view, a prudent investor making a $70 million investment decision would have wanted to know whether state regulation of MBC's sweepstakes promotions could have a material effect on the finances of MBC and F&G. Therefore, Ms. Keach and Ms. Sage maintain that U.S. Trust and its advisors should have taken a careful look at the sweepstakes issues in order to make a fully informed determination of the associated risks. Ms. Keach and Ms. Sage also charge that U.S. Trust was not justified in relying on the fairness opinion of Houlihan or on the legal due diligence of Sonnenschein because neither considered the risks associated with MBC's sweepstakes promotions.

With respect to Houlihan's valuation analysis, the district court ably addressed Ms. Keach and Ms. Sage's concern:

> While Sarafa and Strassman of Houlihan knew that MBC used sweepstakes marketing extensively and that MBC was a main revenue center for F&G, Houlihan did not consider the risk of governmental regulation of the sweepstakes industry or any threat posed by MBC's dependency on sweepstakes in assessing the value of F&G stock. Considering the record in its entirety, it is clear that the reason why Houlihan did not factor these circumstances into its valuation analysis is that no one at the time of the 1995 transaction, including experts in the area of sweepstakes marketing, either knew or reasonably should have known that these matters posed

any material risk to F&G or could be expected to pose any material risk to F&G in the foreseeable future.

R.618 at 90-91.

Like the district court, we are troubled by the absence in the record of any substantive communication between Sonnenschein and U.S. Trust concerning MBC's sweepstakes issues. However, the fact that the due diligence review did not identify or did not document MBC's sweepstakes marketing does not negate, on this record, the reasonableness of U.S. Trust's overall analysis of the merits of the ESOP II transaction in the circumstances prevailing in 1995. Rather, it is important to place U.S. Trust's reliance on Sonnenschein's legal due diligence within the context of the totality of the circumstances of U.S. Trust's valuation process. For instance, the district court found that U.S. Trust went to considerable lengths to understand F&G's business and to assess independently the merits of the transaction, including interviewing members of management, visiting F&G's facilities, reviewing business plans and examining financial documents. The district court also found that, rather than blindly accept the forecasts of F&G officers as to F&G's financial future, "U.S. Trust and Houlihan probed and challenged a number of assumptions in Valuemetrics' evaluation before developing their own independent evaluation that formed the basis for a price per share at closing that was almost 20% less than the selling shareholders' offering price." *Id.* at 90.

Although, as Ms. Keach and Ms. Sage point out, Goldberg of U.S. Trust testified that he would have asked for further information if he had known of the state inquiries and of Awerdick's audit response letters, he also stated that, based on his understanding of the industry, the information that would have been disclosed upon further inquiry would not

have changed the outcome of the ESOP II transaction. When the record establishes that the overlooked matter was one that no one perceived to be a material concern at the time or to be outcome determinative, it cannot be said that the overall investigation was imprudent or in bad faith. ERISA's fiduciary duty of care "requires prudence, not prescience." *DeBruyne v. Equitable Life Assurance Soc'y of the United States*, 920 F.2d 457, 465 (7th Cir. 1990) (internal quotation and citation omitted).

Furthermore, U.S. Trust's inquiry into the ESOP II transaction does not exhibit the same level of imprudence as those cases in which courts have held that the plan fiduciary was not entitled to the adequate consideration exemption. For instance, in *Eyler*, 88 F.3d 445, we held that the plan fiduciaries failed to demonstrate a good faith determination when

> [t]he record d[id] not show that even one director, let alone a majority, sought independent information on the fair market value of the stock. Rather, on the same day the project was presented, the board voted to guarantee a $10 million loan, the proceeds of which would be used to buy the majority shareholder's stock. A prudent person would not have relied upon the dated . . . estimated price range for the ESOP stock purchase in light of the failed [initial public offering] and changed financial conditions at the corporation. Moreover, there is no evidence that the board was knowledgeable about the effects of these changing conditions on the fair market value of [the employer] stock.

*Id.* at 456. In *Eyler*, we specifically noted that several of the factors that the board failed to consider "had a significant impact on the financial condition" of the stock. *Id.* at 455. By contrast, the absence of evidence that MBC's sweepstakes was a meaningful risk to MBC's and F&G's financial future

at the time of the transaction was certainly an important factor in the district court's determination that U.S. Trust had not failed to conduct a good faith inquiry into the merits of the ESOP II transaction.

Other cases confirm that the case before us today cannot be characterized as lacking the requisite good faith on the part of the fiduciaries. Similar to this court's holding in *Eyler*, the Fifth Circuit in *Cunningham*, 716 F.2d 1455, held that the plan fiduciaries' investigation was insufficient because they had relied on an appraisal prepared thirteen to thirty months before the transactions and had failed to consider significant changes in the company's business condition that had occurred in the interim. *Id.* at 1468-73. The court noted that a cursory study of the appraisal report would have revealed that the underlying facts and assumptions no longer were valid at the time of the stock transactions. *Id.* at 1469-70.

The Sixth Circuit's decision in *Chao v. Hall Holding Co.*, 285 F.3d 415 (6th Cir. 2002), similarly supports the view that the decision of the district court was correct. In *Chao*, the Sixth Circuit concluded that the plan trustees had failed to prove that they had made a good faith inquiry into fair market value when: (1) the trustees relied on a valuation by an individual who had valued the wrong company and who testified that, if he had been told that his valuation would be used for an employee stock ownership plan transaction, he would have done a different valuation; (2) the trustees generally were "unaware of what was going on"; (3) the trustees were not consulted on major decisions, such as the price to pay for the stock; (4) the trustees did not engage in any negotiation as to the price of the stock; (5) the trustees were more concerned with the return on the investment for the trust that had financed the stock purchase than for the plan; and (6) the trustees caused the plan to be charged

several thousands of dollars simply to enable the trustees to communicate using round numbers. *Id.* at 429-31, 437.

Finally, in *Katsaros v. Cody*, 744 F.2d 270 (2d Cir. 1984), the Second Circuit upheld a finding that the trustees breached the duty of prudence, under ERISA section 404, because "they passively received a rosy superficial picture of the [company in which they caused the plan to invest] and its holding company from persons with an interest in obtaining their approval. No effort was made to obtain independent professional assistance or analysis of the financial data presented to them." *Id.* at 275. In *Katsaros*, a reasonable investigation would have revealed that the transaction was "totally unsound." *Id.* at 279.

The situation in these cases simply does not resemble that before us. MBC and F&G management consistently testified that the factors that U.S. Trust purportedly overlooked, namely MBC's reliance on sweepstakes and possible government regulation of MBC's sweepstakes and the sweepstakes industry in general, were not considered a significant concern to MBC's and F&G's financial outlook. In addition, nothing in this record suggests that U.S. Trust's valuation process passively relied on the financial information provided by F&G officers: It hired a qualified financial advisor, conducted its own interviews and review of industry information and negotiated a price for the F&G shares that was twenty percent lower than the original offer price. We conclude that the district court properly ruled that the fact that U.S. Trust failed to identify a risk that would not have been considered material does not render U.S. Trust's evaluation of the ESOP II transaction imprudent or in bad faith for purposes of section 408(e).

As we have noted previously, our conclusion that U.S. Trust carried its burden to show adequate consideration is based on the district court's finding that "the reg-

ulatory inquiries made by states attorneys general into MBC's sweepstakes marketing practices and the risk of sweepstakes dependency, was not a material consideration with respect to the propriety of the ESOP II transaction and posed no actual or reasonably foreseeable material risk to F&G at the time of the 1995 transaction." R.618 at 101-02. Ms. Keach and Ms. Sage, however, challenge this finding. In their view, it is based on testimony that was admitted improperly and is clearly erroneous.

Ms. Keach and Ms. Sage first submit that the district court should have excluded opinions expressed at trial by U.S. Trust's expert Durchslag that purportedly were not included in his pre-trial expert disclosure report. A party using a retained expert is required to furnish, prior to trial, a report containing "a complete statement of all opinions to be expressed and the basis and reasons therefor." Fed. R. Civ. P. 26(a)(2)(B). A party shall not be permitted to use any information not so disclosed as evidence at a trial. Fed. R. Civ. P. 37(c)(1). This sanction is " 'automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless.' " *David*, 324 F.3d at 857 (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998)).

The decision to admit previously undisclosed testimony is entrusted to the broad discretion of the district court. *Id.* " 'A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose.' " *Id.* (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999)). However, the district court's discretion should be guided by the following factors: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the

prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.* The opinions of Durchslag offered at trial of which Ms. Keach and Ms. Sage complain include: (1) that neither the inquiries received by MBC from states attorneys general in 1995, nor MBC's use of possibly illegal sweepstakes mailings, presented a material risk to MBC or F&G, and (2) that nothing he knew about sweepstakes regulatory issues in 1995 suggested that MBC's sweepstakes promotions were at significant risk of regulation at the time.[6] Ms. Keach and Ms. Sage submit that

---

[6] The relevant parts of Durchslag's testimony read as follows:

Q. Is there anything about these inquiries that MBC received in 1995 that makes you think that MBC or its parent, Foster & Gallagher, was at risk of significant regulatory or enforcement problems involving sweepstakes?

A. No sir.

. . . .

MR. RHODE: I object to that question. It goes beyond the scope of his disclosed opinions. In his opinions he said "risk of great regulatory or enforcement difficulties."

THE COURT: The objection is overruled. You can cross-examine on that.

A. No, I don't think that they presented risks that were serious. They were things that needed to be addressed with the attorney generals. They were. No action was taken in any of the cases, not even voluntary assurances, which is often the way those matters are resolved with the state attorney generals. And it seemed to me that they did not present a serious risk of regulatory action in 1995.

R.659 at 2159-60.

(continued...)

(...continued)

Q. Does anything you know about sweepstakes regulatory issues in 1995, whether they involve MBC or the industry in general, suggest to you that there was significant risk in MBC's sweepstakes programs in 1995?

MR. RHODE: Objection, Your Honor. This wasn't covered in his report or deposition. His report specifically limits that opinion to his review of those pending inquiries.

MR. ECCLES: The opinion is as to the risk of MBC's programs, Your Honor. This is surely within that risk.

THE COURT: The objection is overruled.

A. No. It was not a time that the regulatory climate seemed to be negative to these type of sweepstakes. Quite the contrary.

Q. Do you think there were clear warning signs in 1995 of the further collapse of direct mail sweeps?

A. No.

*Id.* at 2166.

Cross Examination:

Q. Now in your written report, you stated: "It is my opinion that the inquiries received by Michigan Bulb in 1995 would not have been an indication that the company was at a risk of great regulatory or enforcement difficulties." Is that what you said in your written report?

A. Yes.

Q. And "great," that was the word that you used in your report, right? It was not at risk of great regulatory or enforcement difficulties?

A. Correct.

*Id.* at 2219-20.

(continued...)

these opinions were a sweeping expansion of Durchslag's opinion disclosed in his report prior to trial, that the state inquiries received by MBC in 1995 did not indicate that the company was "at risk of great regulatory or enforcement difficulties." Appellant's Br. at 46. Ms. Keach and Ms. Sage do not assert that the admission of the challenged testimony

---

(...continued)

By the Court:

Q. You said that MBC was not at great risk of regulatory difficulties in '95? That was your opinion?

A. Yes, sir.

Q. Is the word "great" a term of art?

A. No. I was just trying to evaluate it from a lawyer's/ practitioner's point of view in terms of what risks did I see.

Q. Are you familiar with the term "material"?

A. I am.

Q. Is that a term of art?

A. Yes, I think so.

Q. Do you have an opinion as to whether it was a material risk?

A. I do. I do not think it was a material risk.

Q. How would you define the difference, if any, between material risk and great risk?

A. I think they're very similar, Your Honor.

Q. How are they different?

A. Well, material seems to me to be something that's going to affect the financial wealth of the company. Great, to me, has more of a possibility of expectation of any action. In both cases, I think they were not material and they were not great.

*Id.* at 2260-61.

either disrupted the trial or that the lack of disclosure was the result of bad faith or willfulness. Rather, they submit that the previously undisclosed opinions caused them prejudice, which they were not able to cure, because the district court relied on Durchslag's opinions in rejecting their claims. Furthermore, Ms. Keach and Ms. Sage maintain that, if the broader scope of Durchslag's opinions had been disclosed, they could have deposed him accordingly, developed relevant cross-examination strategy and presented rebuttal expert testimony.

The district court acted well within its discretion in admitting the challenged testimony. The differences identified by Ms. Keach and Ms. Sage do not suggest that Durchslag did not fairly disclose the opinions he intended to provide at trial. Moreover, counsel for Ms. Keach and Ms. Sage had the opportunity to address the distinction between the terms on cross-examination, and the district court clarified that Durchslag did not use "great" as a term of art, but as a way to describe his view of the existing risks. Durchslag explained that he believed that "material" was a term of art, and he thought "material risk" and "great risk" were "very similar." R.659 at 2261.

Ms. Keach and Ms. Sage next contend that the district court clearly erred in concluding that the risks associated with MBC's sweepstakes marketing were not material to the ESOP II transaction. In particular, they submit that, in 1995, MBC's "everybody wins" sweepstakes violated the laws of some states, and that, if it were required to comply with such state laws and therefore implement less aggressive promotions, MBC risked lost profits in the future. Ms. Keach and Ms. Sage contend that, if U.S. Trust had conducted a good faith investigation into the risk to F&G's business and had pointed out the risk of having to comply with state laws, U.S. Trust could not have proceeded prudently with

the transaction at the same price. In short, Ms. Keach and Ms. Sage submit that Durchslag's opinions as to the risks of regulatory enforcement are irrelevant because they do not speak to the risk in 1995 that MBC's profits would decline if it was required to comply with state laws.

To support their position, Ms. Keach and Ms. Sage note that, beginning in 1997, MBC did make changes to its sweepstakes promotions in order to comply with laws that existed at the time of the ESOP II transaction. Specifically, they note that MBC discontinued its mailings to customers in Vermont and Connecticut after those states complained that MBC's "everybody wins" promotions were deceptive. Later in 1997, MBC ceased mailing "everybody wins" promotions to nine additional states and decided to make further changes to its sweepstakes. At the time, MBC assumed for budget purposes that the changes would reduce consumer response rates by six and one-half percent and would reduce MBC's profits by $4 million over the next six months. Then, in 1998, MBC decided to change its marketing program in order to comply with the sweepstakes laws in all states.

As U.S. Trust notes, however, there is no evidence in this record that a prudent investigation would have revealed that MBC was violating the laws of any state. In 1995 or before, no enforcement action was initiated, or resolved adversely, against MBC related to its sweepstakes, and MBC never admitted to being in violation of the law. At most, Awerdick had advised MBC in 1991 of his opinion that certain states' laws could be read to bar "everybody wins" sweepstakes. In addition, Awerdick also reviewed MBC's mailings for legal compliance, and the district court found that by 1992 MBC had a practice that no mailings were sent without his approval. Furthermore, none of the changes to MBC's sweepstakes promotions occurred until 1997, and the

district court found credible the testimony at trial of F&G officers that they did not consider MBC's dependency on sweepstakes to be an important concern to the ESOP II transaction. Accordingly, we conclude that the district court was not clearly erroneous in finding that the risks associated with MBC's sweepstakes marketing, if discovered, would not have impacted the propriety of the ESOP II transaction and that those risks were not actual or reasonably foreseeable material risks to F&G in 1995.

## Conclusion

Because the district court correctly determined that there was no breach of fiduciary obligation, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*